AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)     ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | FILED |
|---|---|
| | CLERK, U.S. DISTRICT COURT |
| | September 24, 2021 |
| | CENTRAL DISTRICT OF CALIFORNIA |
| | BY: _____IM_____ DEPUTY |

| United States of America | |
|---|---|
| v. | |
| FERNANDO CARNERO, | Case No. |
| Defendant(s) | 2:21-mj-04474 -DUTY |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of September 24, 2021, in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2113(a) | Attempted Bank Robbery |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

*/s/ Elizabeth Cardenas*
Complainant's signature

Elizabeth Cardenas, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   September 24, 2021

*Patricia Donahue*
Judge's signature

City and state:   Los Angeles, California

Hon. Patricia Donahue, U.S. Magistrate Judge
*Printed name and title*

AUSA: Rachel N. Agress (x0487)

## AFFIDAVIT

I, Elizabeth Langan Cardenas, being duly sworn, declare and state as follows:

### I.    INTRODUCTION

1.    I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed for the past two and a half years.  I am currently assigned to the Violent Crime squad at the FBI Long Beach Resident Agency.  My responsibilities with the FBI include bank robbery investigations in the Central District of California.  I work in conjunction with investigators from the Los Angeles County Sheriff's Department ("LASD") and the Torrance Police Department ("TPD") to investigate bank robberies.

2.    Through the bank robbery and commercial/retail robbery investigations in which I have participated, I have used a variety of investigative techniques, including witness interviews, speaking with law enforcement agents and officers, reviewing surveillance images and cellular telephone data, and reviewing physical evidence.  As a result of this experience and my conversations with other law enforcement personnel, to include FBI Special Agents and local law enforcement detectives with experienced in commercial robbery investigations, I am familiar with the methods used by individuals to commit robberies as well as effective investigative methods to solve them.

### II.   PURPOSE OF AFFIDAVIT

3.    This affidavit is made in support of a criminal complaint against, and arrest warrant for, FERNANDO CARNERO for a violation of 18 U.S.C. § 2113(a) (Attempted Bank Robbery).

1

4.     This affidavit is also made in support of a search
warrant to search the following digital device, in the custody of
TPD in Torrance, California, as described more fully in
Attachment A:  a black Model UMX cellular telephone marked
"Assurance Wireless 4G" issued by Sprint with an unknown IMSI and
phone number 310-896-6061, registered to "Bar Kobi" at "1849
Camden Ave, Los Angeles Ca 90025", and believed to be used by
CARNERO (the "SUBJECT DEVICE").

5.     The requested search warrant seeks authorization to
seize evidence, fruits, or instrumentalities of violations of 18
U.S.C. § 2113(a) (Bank Robbery and Attempted Bank Robbery) (the
"Subject Offenses"), as described more fully in Attachment B.
Attachments A and B are incorporated herein by reference.

6.     The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested complaint, arrest
warrant, and search warrant and does not purport to set forth all
my knowledge of or investigation into this matter.  Unless
specifically indicated otherwise, all conversations and
statements described in this affidavit are related in substance
and in part only.

III. **SUMMARY OF PROBABLE CAUSE**

7.     As detailed below, on September 24, 2021, at
approximately 9:08 a.m., Fernando CARNERO ("CARNERO") entered a
Bank of America branch located at 4206 Pacific Coast Highway,

Torrance, CA 90505 (the "Torrance Bank of America Branch").  He walked up to the teller counter, and handed a note to a teller, W.S., threatening W.S. with a bomb and demanding that the teller hand over unmarked bills in large denominations.  The Torrance Bank of America Branch teller, W.S., went to the back of the bank and along with other employees, called the police.  The police arrived approximately two minutes later and apprehended CARNERO, who had begun to exit the bank when he noticed police activity.  Screenshots of surveillance footage also show CARNERO entering the bank and approaching the teller station.

## IV.  <u>STATEMENT OF PROBABLE CAUSE</u>

8.   Based on my knowledge of and participation in the FBI and local law enforcement investigations described below, my conversations with other agents and law enforcement officials including TPD, Los Angeles County Sheriffs' Department and Redondo Beach Police Department, my review of screenshots from various bank branches' surveillance systems, interviews of witnesses about the events on September 15, 2021 and September 24, 2021, and based on my training and experience, I believe the following:

### A.   **September 24, 2021 Bank of America Attempted Robbery**

9.   On September 24, 2021, at approximately 9:08 a.m., an individual later identified as CARNERO attempted to rob the Torrance Bank of America Branch.  At approximately 9:08 a.m., CARNERO, wearing a white v-neck T-shirt, white baseball cap with "LA" written on it, a white mask, black sunglasses, and with his hands in his pockets, approached a Torrance Bank of America

3

Branch and looked inside through the glass doors, but then continued walking.

10.  A few moments later, CARNERO returned to the front door, entered the bank and approached a teller station, which is captured on the bank's surveillance footage.





11.  A teller, W.S., greeted CARNERO, said hello and asked how CARNERO was doing that day.  At that point, CARNERO, slid a note across the teller counter with one hand, while he kept the

other hand in his pocket.  CARNERO was wearing white latex
gloves.  The note stated, "I have a bomb.  Hand me all large
donominations in large unmarked bills.  Then hand me back this
note.  Right Now!"



12.  W.S. took the note, approached his manager and told
the manager to follow him to the back.  W.S. and the manager
then walked through the doors at the back of the teller section
of the bank, and also told another employee to come along with
them.

13.  Once W.S., his manager and that employee had left the
teller area and were in a separate room, W.S. told a co-worker
who had his phone out to dial 911.  The police were called at
approximately 9:09 a.m., and W.S. described what had happened to
police dispatch on his co-worker's phone.

14.  While on the phone with police dispatch, certain bank
employees were able to see CARNERO through security camera
footage and a through a peephole in one of the doors leading to
the entry area of the bank.  They observed that CARNERO appeared

to be waiting for the teller to return.

15.   At approximately 9:11 a.m., TPD arrived and apprehended the male individual who attempted the robbery and identified him as CARNERO.

16.   Surveillance footage of the attempted robbery shows that CARNERO matches the descriptions given by eyewitnesses:  a male individual with a beard who looked to be in his thirties, wearing a white v-neck T-shirt, white baseball cap with "LA" written on it, a white mask, black sunglasses, and with his hands in his pockets.

   B.   **Following the Attempted Robbery, Law Enforcement Searched CARNERO's Vehicle and Found A Wad of Cash and the SUBJECT PHONE**

17.   CARNERO arrived at the bank in a silvery white 2022 Kia Sportage compact sports utility vehicle ("SUV") bearing no license plate (the "Subject Vehicle").

18.   Following the arrest of CARNERO, based on probable cause to believe the Subject Vehicle was used in the course of the attempted robbery and would contain evidence of that offense, TPD searched the Subject Vehicle.  Pursuant to the search of the Subject Vehicle, law enforcement recovered the following:

      a.   A wad of dollar bills in $100 denominations, amounting to a total of $5,000, located in the glove compartment;

      b.   A white v-neck T-shirt and black athletic shorts;

      c.   The SUBJECT DEVICE;

6

        d.    A black wallet with CARNERO's California Driver's

License, No. B8786570; and

        e.    A temporary paper California license plate,

number BS75Z61, with a screwdriver lying on top of it.  A search

of the paper plate number BS75Z61 revealed that the affiliated

permanent license plate number is 8YBP075, assigned to a 2022

Kia Sportage compact SUV with the VIN number KNDP63AC7N7984138,

registered to "Fernando J. Carnero" and "Loucas Nicholas" at

"3656 Garnet St 101, Torrance 90503".  Based on my training and

experience, individuals who are seeking to evade identification

by law enforcement frequently remove license plates or utilize

temporary license plates.

    C.    **Bank Robbery Series:  September 15, 2021 and September
          17, 2021**

    19.    Law enforcement believes CARNERO to be the perpetrator

of the two bank robberies listed below based on similarities in

the modus operandi of the robber (including handwriting

similarities with another recovered bank note), the physical

description of the robber by witnesses, screenshots of

surveillance video footage from both robberies, and the use of

the Subject Vehicle in at least one of the other robberies.

    20.    Specifically, on September 15, 2021 and September 17,

2021, two bank robberies were committed at two different Chase

Bank branches in Los Angeles County resulting in a total loss of

approximately $52,620:

        a.    On September 15, 2021, at approximately 9:09

a.m., at the Chase Bank located at 1600 S. Pacific Coast

                                    7

Highway, Redondo Beach, California, 90277, with $2,620 of currency stolen; and

   b. On September 17, 2021 at approximately 9:10 a.m., at Chase Bank located at 27319 Hawthorne Boulevard, Rolling Hills Estate, California, 90274, with $50,000 of currency stolen in $100 increments.

  21. Both robberies were committed by a single male suspect who witnesses estimated to be in his 20s or 30s and approximately 5'11" or 6'1" tall, wearing a mask, hat and sunglasses.  Both robberies occurred within approximately ten minutes of 9:00 a.m. The modus operandi of the robber as described in the police reports included entering a bank wearing latex gloves, approaching a teller, and handing the teller a bank note threatening a bomb.  The note from the September 15, 2021 robbery was recovered by law enforcement, and the handwriting and appearance of that bank note matches the bank note recovered from the attempted robbery by CARNERO on September 24, 2021.

September 15, 2021 Bank Note          September 24, 2021 Bank Note




22.   Over the course of investigating the September 17, 2021 bank robbery at the Rolling Hills Estates Chase Bank branch, LASD received video surveillance footage from a nearby Arco carwash showing a white SUV that looked like a KIA Sportage entering and leaving the bank parking lot during the timeframe of the incident.

23.   Based on my review of law enforcement reports and screenshots of surveillance video footage of the robber involved in these two robberies, I believe that the witness descriptions and surveillance images of the robber from these incidents involved persons who resembled CARNERO and/or were wearing similar or identical clothing and accessories as CARNERO wore during the Torrance Bank of America Branch attempted robbery.

24.   Based on my conversation with a TPD police officer who reviewed traffic surveillance footage (also known as "license

plate reader" or "LPR" footage which is recorded by video cameras installed on various street poles and street lights), the officer observed a Kia Sportage driving towards the vicinity of the Rolling Hills Estates Chase Bank branch on September 17, 2021, around the time of the robbery, and departing from that location shortly after.  The Kia Sportage seen on the LPR matched the Kia Sportage seen in the footage provided by the Arco carwash.  The vehicle had a California license plate of BS75Z61.  TPD ran the BS75Z61 license plate and found that it is affiliated with the vehicle assigned permanent license plate number 8YBP075 and assigned VIN number KNDP63AC7N7984138 which is registered to "Fernando J. Carnero" and "Loucas Nicholas" at "3656 Garnet St 101, Torrance 90503", the Subject Vehicle.

25.   In addition, the $5,000 wad of bills found in the Subject Vehicle following the attempted robbery was in denominations of $100, as was the $50,000 taken by the robber from the Rolling Hills Estates Chase Bank branch on September 17, 2021.

26.   Based on my training and experience, and the facts set forth above, I believe that the SUBJECT DEVICE likely contains evidence of the Subject Offenses.  Specifically, individuals who commit successive bank robberies often utilize their digital devices to photograph potential bank targets, perform google searches of potential bank targets, utilize navigation systems to assist in travel to bank target locations, perform google searches related to bank robbery techniques, and utilize or save bank information to deposit proceeds of the bank robberies.

Phones are also likely to contain geolocation information that may help place CARNERO at the robberies under investigation.  The SUBJECT DEVICE therefore likely has relevant evidence related to the Subject Offenses.

### V.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES

27.  As used herein, the term "digital device" includes the SUBJECT DEVICE.

28.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

29.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus,

12

often a controlled environment with specially trained personnel
may be necessary to maintain the integrity of and to conduct a
complete and accurate analysis of data on digital devices, which
may take substantial time, particularly as to the categories of
electronic evidence referenced above.

b.   Digital devices capable of storing multiple
gigabytes are now commonplace.  As an example of the amount of
data this equates to, one gigabyte can store close to 19,000
average file size (300kb) Word documents, or 614 photos with an
average size of 1.5MB.

30.   The search warrant requests authorization to use the
biometric unlock features of a device, based on the following,
which I know from my training, experience, and review of publicly
available materials:

a.   Users may enable a biometric unlock function on
some digital devices.  To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical
feature matches one the user has stored on the device.  To
unlock a device enabled with a fingerprint unlock function, a
user places one or more of the user's fingers on a device's
fingerprint scanner for approximately one second.  To unlock a
device enabled with a facial, retina, or iris recognition
function, the user holds the device in front of the user's face
with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock
function will not unlock a device even if enabled, such as when

13

a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c.   The person who is in possession of a device or has the device among his belongings is likely a user of the device. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress CARNERO's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of CARNERO's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

31.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### V. <u>CONCLUSION</u>

32.   For all the reasons described above, there is probable cause to believe that CARNERO has committed a violation of 18 U.S.C. § 2113(a):  Attempted Bank Robbery.  There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICE described in Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _24th_ day of
September, 2021.

_____
Patricia Donahue